**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| **In re: Paul David Ensign, Jr., Debtor** | ˙**No. 5:08-bk-74027** |
| | **Ch. 7** |

| | |
|---|---|
| **Bobby J. Graham, Executor of the** | **Plaintiff** |
| **Estate of Ona Elnora Burwell Ensign** | |

**v.**          **Adv. Proc. No. 5:10-ap-07019**

**Paul David Ensign, Jr.**          **Defendant**

**and**

| | |
|---|---|
| **In re: Paul David Ensign, Sr., Debtor** | ˙**No. 5:10-bk-72578** |
| | **Ch. 7** |

| | |
|---|---|
| **Bobby J. Graham, Executor of the** | **Plaintiff** |
| **Estate of Ona Elnora Burwell Ensign** | |

**v.**          **Adv. Proc. No. 5:10-ap-07097**

**Paul David Ensign, Sr.**          **Defendant**

**OPINION AND ORDER**

On February 5, 2010, Bobby J. Graham, as Executor of the Estate of Ona Elnora Burwell Ensign [Graham], filed a Complaint to Determine Dischargeability of Debt against debtor Paul David Ensign, Jr. [David Jr.]. On July 8, 2010, Graham filed a similar complaint against another debtor Paul David Ensign, Sr. [Paul Sr.], David Jr.'s father. Graham alleges in the complaints that the debt embodied by the judgment entered against David Jr. and Paul Sr., individually, by the Circuit Court of Benton County, Arkansas, on June 30, 2008, cannot be discharged in either David Jr.'s or Paul Sr.'s respective bankruptcy cases under § 523(a)(2)(A), (2)(B), and (4). The Court consolidated the adversary proceedings for hearing at the request of the parties, and the Court held a hearing on January 13, 2011. At the hearing, Graham did not introduce evidence sufficient to

support the § 523(a)(2)(B) and (4) causes of action.  Therefore, Graham's requests for relief under § 523(a)(2)(B) and (4) are denied.  However, for the reasons stated below, Graham's request for relief under § 523(a)(2)(A) in each adversary proceeding is granted.

**Jurisdiction**

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The following order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**Applicable Law**

Section 523(a)(2)(A) provides that a debtor is not entitled to a discharge of any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . . *false pretenses, a false representation, or actual fraud*, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A) (emphasis added).  To prevail under this section, the plaintiff must prove that the debtor, individually: (1) made a representation, (2) that the debtor knew at the time was false, (3) that the debtor "made the representation deliberately and intentionally with the intention and purpose of deceiving" the plaintiff (4) that the plaintiff justifiably relied on the representation, and (5) that the plaintiff sustained damage as a proximate result of the representation.  *Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).  Section 523(a)(2)(A) provides for three types of "representations"—false pretenses, a false representation, and actual fraud.  If a debtor's actions in incurring a debt include any of these representations, and the remaining elements of § 523(a)(2)(A) are met, the Court must find the debt nondischargeable.

At trial, Graham introduced the circuit court order and judgment in which the circuit court found that both Paul Sr. and David Jr. perpetrated a constructive fraud upon Ona Elnora Burwell Ensign [Ona].  The doctrine of collateral estoppel precludes a court from

2

conducting further proceedings on issues that have been litigated and ruled upon previously. *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 641 (8th Cir. 1999). For the reasons stated below, the Court finds that it is collaterally estopped by the circuit court order from conducting further proceedings on some of the elements of § 523(a)(2)(A) and from relitigating some of the factual determinations.

In determining whether the rulings in the circuit court order are entitled to preclusive effect, the Court must apply the law of Arkansas. *Id.* (stating that the court must look to the substantive law of the forum state in applying collateral estoppel). In Arkansas, there are four elements required to establish collateral estoppel: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment." *Riverdale Dev. Co. v. Ruffin Bldg. Sys., Inc.*, 146 S.W.3d 852, 855 (Ark. 2004). The extent to which these four elements are met determines whether this Court is precluded from conducting further proceedings on certain elements of § 523(a)(2)(A) and from making certain factual determinations.

### (1) Whether the Issues Sought to Be Precluded Are the Same as Those Involved in the Prior Litigation

The circuit court litigation was brought by Graham, as executor of the Estate of Ona Elnora Burwell Ensign, Deceased, against Paul and David Ensign [the Ensigns], individually.[1] The circuit court action concerned the sale of 33 acres from Ona to David Jr. for $250,000.00, Ona's physical and mental health at the time of the sale, and the subsequent sale of the 33 acres to Dixie Real Estate and Dixie Management [Dixie Management] for $979,440.00. The circuit court order reflects that Graham brought three causes of action against the Ensigns—constructive fraud, deceit, and

---

[1] The action was also brought against Paul Sr. and MDF Estate Planning Services, Inc. in their capacity as co-trustees of the Ensign Investment Trust.

3

misrepresentation. However, the circuit court order focused exclusively on constructive fraud. The issues before this Court that are the same as those that were involved in the circuit court litigation are two-fold: (1) the elements of constructive fraud that mirror elements of § 523(a)(2)(A), and (2) several findings of fact concerning Ona, David Jr., Paul Sr., and the two sales of the 33 acres.

First, certain elements of constructive fraud, the cause of action in the prior litigation, mirror elements of § 523(a)(2)(A), the cause of action in the present litigation. Under Arkansas law, constructive fraud is the "'breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others.'" *Lane v. Rachel*, 389 S.W.2d 621, 624 (Ark. 1965) (quoting 37 C.J.S. *Fraud* § 2). A "claim for constructive fraud . . . requires proof of all of the elements of actual fraud except scienter." *Yarborough v. DeVilbiss Air Power, Inc.,* 321 F.3d 728, 730 (8th Cir. 2003) (interpreting Arkansas law regarding actual and constructive fraud). The elements of actual fraud under Arkansas law are "a false representation (usually of a material fact), knowledge or belief by the defendant that the representation is false, intent to induce the plaintiff's reliance, justifiable reliance by the plaintiff, and resulting damage to the plaintiff." *Id*. Additionally, at least one case equates the scienter (knowledge) requirement with the fraudulent intent element and states that, under Arkansas law, a plaintiff that pleads constructive fraud does not have to prove "scienter, or fraudulent intent." *Morrison v. Back Yard Burgers, Inc*., 91 F.3d 1184, 1188 (8th Cir. 1996) (adding that a plaintiff "must still prove the other elements of common law fraud, including a false representation of a material fact and justifiable reliance upon the representation"). Based on the above law, a cause of action for constructive fraud under Arkansas law places at issue the false representation,[2] justifiable reliance, and damage elements of § 523(a)(2)(A), but it does not place at issue the two

---

[2] Constructive fraud requires a showing that a representation was made and that it was false, but not that the defendant *knew* the representation was false. This satisfies the first element of § 523(a)(2)(A), but only part of the second element.

4

elements of § 523(a)(2)(A) concerning (1) a debtor's knowledge that the representation is false and (2) a debtor's intent to deceive. Therefore, the first element of collateral estoppel is met as to the false representation, justifiable reliance, and damage elements of § 523(a)(2)(A). If the remaining three elements of collateral estoppel are met, then the Court is precluded from relitigating the false representation, justifiable reliance, and damage elements of § 523(a)(2)(A).

Second, several facts concerning Ona, David Jr., and Paul Sr. that were issues in the prior litigation are also issues in this adversary proceeding, and, therefore, are likewise barred from relitigation if the remaining three elements of collateral estoppel are met. *See Taylor v. Hamilton*, 205 S.W.3d 149, 155 (Ark. App. 2005) (holding that collateral estoppel "bars the relitigation of issues of law or fact actually litigated in the first suit"). The circuit court order made several findings of fact concerning (1) Paul Sr.'s and David Jr.'s actions regarding the two sales of the 33 acres, (2) Ona's mental and physical health, and (3) the relationships between Paul Sr., David Jr., and Ona. Findings of fact concerning these three categories weighed toward proving constructive fraud—whether the Ensigns breached a legal or equitable duty to Ona and whether that breach tended to deceive Ona. Also, because the eight-page, detailed circuit court order focused heavily on facts concerning these three categories—including several findings of fact concerning all three—the findings of fact concerning the above categories were material and were "at issue" in the proceeding below. Similarly, these findings of fact concerning Paul Sr.'s and David Jr.'s actions; Ona's physical and mental health; and the relationships between Paul Sr., David Jr., and Ona are at issue in proving a § 523(a)(2)(A) claim—most importantly, the knowledge and intent elements.

Therefore, in addition to the representation, justifiable reliance, and damage elements of § 523(a)(2)(A) being issues in the circuit court proceeding, the Court finds that the circuit court's findings of fact concerning (1) Paul Sr.'s and David Jr.'s actions regarding the two sales of the 33 acres, (2) Ona's mental and physical health, and (3) the relationships between Paul Sr., David Jr., and Ona were at issue in the circuit court proceeding and are

5

relevant in this adversary proceeding. In sum, the first element of collateral estoppel is met with regard to the first, fourth, and fifth elements of § 523(a)(2)(A) and as to the three categories of factual findings enumerated above.

### (2) Whether the Issues Were Actually Litigated and (3) Whether the Issues Were Determined by a Valid and Final Judgment

According to the circuit court order, the Ensigns appeared in person and through their attorney at the circuit court hearing, and both of the Ensigns testified. Additionally, the circuit court made detailed factual findings in its order. Therefore, the Court finds that the issues identified above were actually litigated. Further, it is uncontroverted that neither party appealed the circuit court order, and the circuit court order is a valid and final order. Accordingly, the Court finds that the second and third elements of collateral estoppel have been met.

### (4) Whether the Determination of the Issues Were Essential to the Judgment

The determinations of whether the Ensigns made a representation that was false, whether Ona justifiably relied upon the representation, and whether damages were incurred were essential findings to the circuit court order. Those determinations were essential because they were elements that had to be met in order for the circuit court to find that the Ensigns perpetuated a constructive fraud upon Ona. *See Yarborough*, 321 F.3d at 730 (stating that a "claim for constructive fraud . . . requires proof of all of the elements of actual fraud except scienter.)"

Further, the circuit court order's emphasis on the fact findings concerning Paul Sr.'s and David Jr.'s actions regarding the two sales of the 33 acres; Ona's mental and physical health; and the relationships between Paul Sr., David Jr., and Ona show that the circuit court relied on these findings of fact in concluding that Paul Sr. and David Jr. perpetuated a constructive fraud on Ona. For example, the circuit court connected certain fact findings to its holding that the Ensigns perpetrated a constructive fraud: "[i]t is clear to

6

the court from credible evidence presented that *Ona did not have the requisite mental capacity to execute the deed* David presented, and that *David and Paul worked together to acquire Ona's property* in David's name in such a manner that it constituted constructive fraud."[3]  (Pl.'s Ex. A at 4–5.) (emphasis added).  The circuit court again linked certain findings of fact to its holding in the following sentence: "[t]he compelling conclusion for this court is that Paul Ensign and David Ensign perpetuated a constructive fraud upon Ona Ensign, their *88 year old, feeble, confused aunt*."  (Pl.'s Ex. A at 5.) (emphasis added).  Therefore, the Court finds that the findings of fact in the circuit court order concerning Paul Sr.'s and David Jr.'s actions regarding the two sales of the 33 acres; Ona's mental and physical health; and the relationships between Paul Sr., David Jr., and Ona were determinations essential to the circuit court judgment.

Because the elements of collateral estoppel have been met, this Court is precluded from relitigating the first, fourth, and fifth elements of § 523(a)(2)(A).  Accordingly, based on the circuit court order, the Court finds that the Ensigns, individually, made a false representation, that Ona justifiably relied on the false representations, and that Ona was damaged as a result of the false representations in the amount of $729,400.00.[4]  Also, based on the above, the Court finds that it is precluded from relitigating the circuit court's findings of fact regarding (1) Paul Sr.'s and David Jr.'s actions regarding the two sales of the 33 acres, (2) Ona's mental and physical health, and (3) the relationships between Paul Sr., David Jr., and Ona.  Despite these findings, Graham must still meet the remaining elements of § 523(a)(2)(A)—whether Paul Sr. and David Jr., individually, knew their respective representations were false at the time they were made and whether Paul Sr. and David Jr. made their respective representations with the intention and purpose of deceiving Ona.  The relevant findings of fact and conclusions of law with regard to these

---

[3]  The circuit court order and the parties at the January 13 hearing referred to Paul David Ensign, Jr. as "David" and Paul David Ensign, Sr. as "Paul."

[4]  The circuit court entered a judgment against the Ensigns in the amount of "$979,400 less the $250,000 paid."  (Pl.'s Ex. A at 7.)

two remaining elements are discussed below.

**Findings of Fact**

David Jr., Paul Sr., and Ona are family.  David Jr. is Paul Sr.'s only child, and, according to the circuit court order, David Jr. and Paul Sr. are "very close."[5]  Ona, now deceased, is Paul Sr.'s aunt by marriage.  The testimony in circuit court was "unequivocal that Ona harbored ill feelings toward Paul," but that "Ona retained a good relationship with David."  (Pl.'s Ex. A at 2.)  David Jr. testified at the January 13 hearing that he had known Ona as long as he could remember.  Ona was married to Olen, who predeceased her.  Both Ona and Olen had family members that were beneficiaries of their estates. Additionally, "[t]he family was all very much aware from Ona that she and her husband Olen had 'will contracts' so each of their families would get one-half of their estate." (Pl.'s Ex. A at 2.)  Graham testified that Paul Sr. was a beneficiary of Ona's estate, but David Jr. was not.  Paul Sr. testified that he was aware several people were to inherit under Ona's will.

Ona owned 33 acres of real property in Benton County, Arkansas.  In spring 2003, Paul Sr. began negotiating the sale of Ona's property to Jennifer Talley of Dixie Management, even though neither David Jr. nor Paul Sr. owned Ona's property at this time.[6]  Paul Sr. stated he had his son's permission to negotiate and show the property, but he did not testify that he had Ona's permission.[7]  While Paul Sr. was negotiating the sale of land he

---

[5]  At one time, David Jr. and Paul Sr. were partners in an electrical business. (Pl.'s Ex. A at 2.)

[6]  Paul Sr. was also negotiating with Talley for the sale of real property he obtained from his mother.  The circuit court order noted that Ona's property was "more desirable for development because it was highway frontage property."  (Pl.'s Ex. A at 2.)

[7]  The Court does not know whether Ona or David Jr. owned the property when Paul Sr. showed the property to Tally because Paul Sr. could only recall he showed it to Talley "sometime in December."

did not own, David Jr. "approached" Ona about her property.[8] (Pl.'s Ex. A at 2.)  At this time, in spring 2003, Ona was 88 years old and experiencing "serious health problems" that "continued to worsen throughout the year . . . ."  (Pl.'s Ex. A at 2.)

While the Court has few details concerning the conversations that took place between Ona and David Jr. regarding Ona's property, David Jr. introduced into evidence an Offer and Acceptance, dated March 31, 2003, signed by David Jr. and Ona.  The Offer and Acceptance described real property being conveyed as "certain property located in Benton County, Arkansas as described on Exhibit 'A' attached hereto."  However, as the circuit court pointed out, "there was no legal description of any kind contained therein or attached thereto."  (Pl.'s Ex. A at 2.)  The contract stated that the property was being sold by Ona to David Jr. for $250,000.00 and that David Jr. had 120 days to obtain financing, which David Jr. "never attempted" to obtain.  (Pl.'s Ex. A at 2.)  The Offer and Acceptance expired without extension.[9] (Pl.'s Ex. A at 2.)

In mid-October 2003, Ona was hospitalized "with diabetes, COPD, congestive heart failure, valvular heart disease and hypertension, among other things.  From the hospital, Ona was transferred to a nursing home.  Her mental state was deteriorating, and she was suffering some dementia and cognitive loss."  (Pl.'s Ex. A at 2.)  By mid-November, Ona "was no longer capable of making decisions for herself, she was confused and had some

---

[8] David Jr. testified that he and his aunt had previously spoken about the property in 2001.  David Jr. testified that he told Ona he wanted to build a shop on the property and that if she was ever going to sell it to "give him a shot."  David Jr. also testified at the January 13 hearing that Ona called him one week before the Offer and Acceptance was signed and offered to sell him the property for $250,000.00.  In comparison, the circuit court order states that "David approached Ona" about the sale of her property.  (Pl.'s Ex. A at 2.)  To the extent these two conflict, the circuit court order controls.

[9] After the Offer and Acceptance deadline expired, David Jr. did eventually obtain financing for the property with Arkansas National Bank, the details of which will be discussed below.

indications of depression."  (Pl.'s Ex. A at 2.)  On November 26, 2003, Ona's brother
Orville, who was also her financial advisor and confidante, died.  (Pl.'s Ex. A at 2–3.)
After Orville's death, Ona "had a lady from her bank (Arvest) to prepare and notarize a
Durable Power of Attorney so her nephew, Harvey Burwell, could handle her financial
affairs."[10]  (Pl.'s Ex. A at 4.)

Paul Sr. testified at the January 13 hearing that he visited Ona at the nursing home twice.
When asked what Ona's health was like in 2003, Paul Sr. answered that he did not know
because "it had been a long time."  Despite his initial lack of knowledge as to Ona's
health, Paul Sr. answered, in response to a question about his knowledge of Ona's health
"around the transaction in question" that "she wasn't in real good health but her mind
was real sharp."  Paul Sr. also testified that he was not aware of Ona's mental and
physical condition until the trial in circuit court.  Paul Sr. later said that he disagreed with
some of the findings in the circuit court order regarding Ona's health problems.

Like Paul Sr., David Jr. testified at the January 13 hearing that he visited Ona a "few"
times in the nursing home.  David Jr. stated that he was usually by himself when he
visited.  During one of David Jr.'s visits in which he and Ona were alone, David Jr.
presented Ona with a deed that had been previously notarized.  Ona executed the pre-
notarized deed, thereby selling her interest in the 33 acres to David Jr. for $250,000.00.
(Pl.'s Ex. A at 5.)  David Jr. testified at the January 13 hearing that he was aware Harvey
was going to be given Ona's power of attorney.  According to David Jr., Ona told him at
closing that "they were working on getting [the power of attorney] for Harvey . . . they
were working on getting that done for Harvey after Orville passed away."  In fact, David
Jr. testified that Ona told him Harvey was supposed to be at closing but that Harvey had
to work that day, and that Ona said she did not need Harvey there.  The circuit court

---

[10]  It is unclear whether anyone was helping Ona transfer her power of attorney.
Considering her mental capacity at that time as recited by the circuit court, it is unlikely
Ona had the ability to transfer her power of attorney.

found that "Harvey was never informed of any of the negotiations on the property" (Pl.'s Ex. A at 4), and David Jr. testified at the January 13 hearing that he did not communicate with Harvey regarding the sale of the property.

David Jr. was eventually able to secure financing for the $250,000.00 with Paul Sr.'s help. David Jr. testified that the president of Arkansas National Bank indicated that it might be "rough" for David Jr., by himself, to borrow $250,000.00. Because David Jr. could not secure the loan, Paul Sr. borrowed the money from Arkansas National Bank and loaned the money to David Jr.[11] Paul Sr. testified at the January 13 hearing that a few days after March 31, 2003, the day that David Jr. and Ona executed the Offer and Acceptance, David Jr. approached Paul Sr. to borrow $250,000.00. Paul Sr. testified that a few days after David Jr. approached him about borrowing the $250,000.00, Paul Sr. contacted Arkansas National Bank about a $250,000.00 loan. On September 24, 2003, Arkansas National Bank had an appraisal made on Ona's property in connection with loaning Paul Sr. the money to purchase Ona's land. The appraisal report stated that Ona's property appraised for $585,000.00. Graham's counsel questioned David Jr. about the appraisal:

> Counsel for Graham: When you acquired the loan from the bank, did they do an appraisal?
>
> David Jr.:   Yes they did
>
> Counsel for Graham: What did they appraise it for?
>
> David Jr.:   It appraised for five hundred and some thousand at the time.
>
> Counsel for Graham: Did you tell your aunt that it had been appraised for $500,000.00?
>
> David Jr.:   No, there was never any discussion about the appraisal on it.

---

[11]  David Jr. testified that there are "no documents" evidencing the loan between Paul Sr. and David Jr.

On December 19, 2003, Paul Sr. executed a promissory note with Arkansas National Bank in the principal amount of $251,751.67, and on the same date, David Jr. executed a corresponding mortgage securing a lien on real property located at 8905 Hwy 12 West in Benton County, Arkansas.[12]  (Def.'s Ex. 4, 5.)  The lien was also secured by a mortgage on Paul Sr.'s home, which he had purchased for $80,000.00 and owned free and clear of liens.  (Def.'s Ex. 4.)

Paul Sr.'s testimony regarding his involvement in the two sales of Ona's land was obfuscatory.  At the January 13 hearing, Paul Sr. testified that he did not know his son was trying to buy Ona's property until David Jr. called him asking about the $250,000.00, and that this was the first time Paul Sr. had any contact with anyone about Ona's property.  Paul Sr. asserted that he did not do any "legwork" on Ona's property, other than obtaining the financing for David Jr.  However, Paul Sr. admitted to other "legwork," including negotiating with Talley and showing her the property.  Additionally, in early 2004, Paul Sr. negotiated various trusts, including the trust that held Ona's land, the Junior Trust.[13]  (Pl.'s Ex. A at 7; Def.'s Ex 9.)  Paul Sr. was the co-trustee (with MDF Estate Planning Services, Inc.) and "sole second beneficiary or remainder beneficiary" of the Junior Trust.  (Def.'s Ex. 9.)  When asked on cross-examination whether it was simply an "accident" that he negotiated these trusts and became the co-trustee and a beneficiary, Paul Sr. answered "yes."

Few details about the "closing" between Ona and David Jr. are in evidence.  Also, neither

---

[12]  From the testimony and exhibits, it appears that the property mortgaged was the property David Jr. purchased from Ona, though no one testified to the physical address of Ona's property.

[13]  The Ensigns' reason for creating several trusts was not entirely clear from the testimony on January 13, although the circuit court found that several holding trusts were set up "in an attempt to become judgment proof and insulate themselves from repayment" to Ona's Estate."  (Pl.'s Ex. A at 7.)

12

party introduced the deed between David Jr. and Ona. However, the deed and the circumstances surrounding the closing were described in the circuit court order. David Jr. "introduced a deed on which he obtained Ona's signature at the nursing home." (Pl.'s Ex. A at 3.) The deed "had been notarized in advance of [Ona's] signature by a lender from his father's bank." (Pl.'s Ex. A at 3.) After David Jr. had Ona sign the pre-notarized deed, he then deposited Ona's $250,000.00 in sale proceeds into Ona's bank account. David Jr. testified at the January 13 hearing that Ona had asked him to go to her bank and use the sale proceeds to buy a certificate of deposit [CD]. However, the bank said it could not set up a CD for Ona until Harvey was transferred Ona's power of attorney. David Jr. proceeded to deposit the $250,000.00 into Ona's bank account and did not inform anyone that he had done so or that Ona had wanted to purchase a CD. The circuit court summarized its findings concerning the facts surrounding the "closing" succinctly:

> David had a deed prepared, had the deed notarized by his dad's lender, had Ona sign it in her room all alone at the nursing home and then deposited funds his dad borrowed and gave to him into Ona's account.[14] There was no "closing" and there was never a person independent of David and Paul involved in the physical transaction. . . . David controlled the timing and the setting for the transaction. He could have easily involved other family members, nurses, doctors or other medical personnel who could have vouched for Ona's ability to understand what was happening and who could have vouched for what information David gave her to induce her to sign the deed.

(Pl.'s Ex. A at 6.)

Additionally, David Jr. did not disclose to Ona where the $250,000.00 came from, but according to David Jr., "she never asked" and despite Ona and Paul Sr.'s poor relationship—which David Jr. contended was "good"—David Jr. said the source of the

---

[14] David Jr. testified that someone from Arkansas National Bank named Sherri was present at the deed signing. The circuit court order referenced a Sherri Goss in its order, and found that her testimony was not credible and that David Jr. was alone with Ona at closing. (Pl.'s Ex. A at 5.)

13

funds "wouldn't have mattered" to Ona.[15]  David Jr. also did not disclose to Ona or a person acting on Ona's behalf that the property had been appraised months before Ona executed the deed and that he had received the deed for Ona's property in exchange for $250,000.00.

David Jr. had once told Ona that he wanted to buy her property so that he could build a shop or a warehouse.[16]  (Pl.'s Ex. A at 3.)  However, on December 26, 2003, within about a week of David Jr. receiving the deed from Ona, Paul Sr., at David Jr.'s direction, signed a real estate contract selling the property to Dixie Management for $924,000.00.  (Def.'s Ex. 6.)  The contract listed the "Seller" as "Paul D. and David D. Ensign."[17]  (Def.'s Ex. 6.)  Neither David Jr. nor Paul Sr. told anyone in the family that they intended to sell the property David Jr. purchased from Ona for $250,000.00 to Dixie Management for $924,000.00.

The testimony at the January 13 hearing surrounding what David Jr. knew about Paul Sr.'s negotiations with Dixie Management and when he knew it was unclear.  Initially, David Jr. testified that he had no knowledge Paul Sr. was working on selling Ona's property after David Jr. had purchased it.  However, David Jr. later testified to having some knowledge about Paul Sr.'s actions.  David Jr. testified that he first became aware of Paul Sr.'s actions when Talley tried to contact David Jr. shortly after David Jr. obtained the property from Ona.  Talley called Paul Sr. asking for David Jr.  David Jr. was out of town at the time of this contact.  David Jr. told Paul Sr. over the phone to tell

---

[15]  Later in his testimony, David Jr. admitted that he did not know whether Ona would have sold the property if she knew that Paul Sr. was "negotiating the deal."

[16]  *Supra* n. 8.

[17]  Presumably, the "David D." refers to David Jr., although he has no middle name beginning with "D."  Paul Sr. testified that Talley filled out the real estate contract. The state court order states that Talley testified that she "believed all during the negotiations that Paul was an owner of Ona's property he was negotiating to sell."  (Pl.'s Ex. A at 4.)

Talley that he would "take a million dollars" for the property.  David Jr. added that, at that time, "we've got an appraisal for five hundred and something thousand, you tell somebody that's it's going to take a million dollars to buy and normally they will say no thanks and leave.  And she didn't."  That same day, David Jr. told Paul Sr. to sign the real estate contract with Dixie Management.  In contrast, in circuit court, David Jr. and Paul Sr. both testified that they were completely unaware of each other's separate actions:

> Paul and David Ensign both testified to an incredible tale of neither being aware of what the other was doing, having no discussions about purchase price or selling price, or even that Paul was negotiating with Jennifer Talley to sell Ona's property that David was trying to get his hands on.[18]

(Pl.'s Ex. A at 3).

Ona died February 11, 2004.  The next day, David Jr. amended the offer and acceptance between Dixie Management and Paul Sr. to add David Jr. as a seller.  (Def.'s Ex. 7.)  Shortly after Ona's death, "Paul negotiated the terms of a trust for the property to be transferred into.  Paul became a co-trustee and sole beneficiary of that trust.  The trust then transferred the real estate to Paul's buyer, Dixie Management.  David took $200,000.00 outright from the sale."  (Pl.'s Ex. A at 7.)  The trust held the remainder, either in "cash, annuities, investments or real estate or a combination," including two tracts of land in Franklin County that the trust purchased, "which are used by Paul and David for recreation and pleasure."  (Pl.'s Ex. A at 7.)  An annuity was set up to pay an annual sum to David Jr., with the remainder to go to Paul Sr. at David Jr.'s death.  (Pl.'s Ex. A at 7.)  The circuit court found that "Paul and David then set about creating holding trusts immediately upon the conclusion of this transaction in an attempt to become judgment proof and insulate themselves from repayment to the Plaintiff herein [Ona's estate]."  (Pl.'s Ex. A at 7.)

---

[18]  David Jr. also testified at the January 13 hearing that he did not know when he first met Jennifer Talley of Dixie Management, but David Jr. stated he had "seen her around."

David Jr. testified at the January 13 hearing that it was not his intent to sell Ona's property so quickly or at an enormous profit:

> Attorney for Graham: If your father had such a good relationship with your Aunt Ona, why didn't he just go directly to her and say 'Aunt Ona, I have someone who's interested in your property for a million dollars and I am going to give you $250,000.00 for it?'
>
> David Jr.: He wasn't out shopping the property. He didn't know . . . I was the one that had the offer and acceptance signed on this property and my aunt is the one that called me and offered to sell the property for that. It was not a matter of, you know, him going to her and trying to sell her property. It was, I was buying the property, and after it was all said and done, Dixie [Management] just, they wanted it. I mean it was, I never dreamed that they would come to me and offer, that you know, whenever I priced it to them, like I said I figured they would go away. I wasn't intending on selling it for just boom and selling it. It was not my intent at all.
>
> Attorney for Graham: It was your intent to hang on to the property?
>
> David Jr.: For a while at least, yeah, I was going to figure out what I wanted to do with it, what I was going to be able to do with it.

## Conclusions of Law

As stated earlier, collateral estoppel precludes this Court from relitigating the first, fourth, and fifth elements of § 523(a)(2)(A) and the three categories of facts set forth above. The second and third elements—whether Paul Sr. and David Jr., individually, knew their respective representations were false at the time they were made and whether Paul Sr. and David Jr. made their respective representations with the intention and purpose of deceiving Ona—must still be met. Based on the circuit court order and the evidence and testimony from the January 13 hearing, the Court finds that Graham met his

16

burden of proving the second and third elements with regard to both David Jr. and Paul Sr. The debt of Paul David Ensign, Jr., is a nondischargeable debt on account of false pretenses and actual fraud. The debt of Paul David Ensign, Sr., is a nondischargeable debt on account of actual fraud. The Court will explain its reasoning below.

### David Jr.'s False Pretenses and Actual Fraud

David Jr.'s false representations fit within the false pretenses and actual fraud provisions of § 523(a)(2)(A). A false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression. *Moen*, 238 B.R. at 791. A "'[f]alse pretense' may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak." *Id*. "Actual fraud" is defined by the Eighth Circuit Bankruptcy Appellate Panel as consisting of "'any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetuating what is known to be a cheat or deception.'" *Id*. at 790 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)). Regardless of the characterization of David Jr.'s actions, the five elements of § 523(a)(2)(A) must still be met.

Because the circuit court found that both Ensigns perpetrated a constructive fraud upon Ona, it necessarily found a false representation and justifiable reliance upon that representation. *See Yarborough*, 321 F.3d at 730. The circuit court order also satisfies the damage element and awarded damages in the amount of $729,400.00. Therefore, the remaining elements before this Court are whether David Jr. knew at the time he made the representation that it was false and whether David Jr. made the representation deliberately and intentionally with the intention and purpose of deceiving Ona.

In determining whether a debtor possesses knowledge of the falsity of the representation "'the Court must consider the knowledge and experience of the debtor.'" *Moen*, 238 B.R. at 791 (quoting *Federal Trade Comm'n v. Duggan* (*In re Duggan*), 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)). "A false representation made under circumstances where a

debtor should have known of the falsity is one made with reckless disregard for the truth, and this satisfies the knowledge requirement." *Id.* "Reckless conduct refers to unreasonable conduct in disregard of a known or obvious risk from which it is highly probable that harm would follow. . . . It is usually accompanied by a conscious indifference to the consequences." *Visotsky v. Woolley* (*In re Woolley*), 145 B.R. 830, 834 (Bankr. E.D. Va. 1991).

The Court finds that David Jr. knew his representation was false at the time he made it. David Jr.'s representation consisted largely of his silence to Ona, and more importantly, to anyone capable of making decisions on Ona's behalf, about his *knowledge* of the extraordinary circumstances surrounding her execution of a deed. Before closing with Ona, David Jr. knew that Paul Sr. was negotiating with Arkansas National Bank to fund his purchase of Ona's land. Based on the testimony at the January 13 hearing, this Court infers that David Jr. knew about the appraisal Arkansas National Bank ordered and for how much the property appraised. At the January 13 hearing, David Jr. testified that, at the time of Talley's "first" contact with David Jr.—which was within a week of closing with Ona—he was aware of the amount of the appraisal. David Jr. was not asked whether he knew the amount Ona's property had appraised for *when or before* he closed with Ona. However, when asked whether he told Ona that her property had appraised for $500,000.00, he answered, "No, there was never any discussion about the appraisal on it." David Jr. offered no defense that discussions with Ona did not take place because he was not aware for how much Ona's property appraised. Also, David Jr. was involved in the transaction with Arkansas National Bank. Although Paul Sr. requested the loans from Arkansas National Bank, David Jr. granted the bank a mortgage on the property he purchased from Ona to serve as security for the loan. Additionally, given the fact that David Jr.'s first offer to Talley was for one million dollars, it is difficult to believe David Jr. thought the value of Ona's property was just $250,000.00. In sum, David Jr. knew about the appraisal within one week after he closed with Ona, testified as if he had knowledge of the appraisal before closing with Ona, and he was close enough to Paul Sr. and the transaction with Arkansas National Bank to learn for how much Ona's property

18

appraised. Therefore, the Court finds that David Jr. was aware at the time he closed with Ona that the property was worth at least $585,000.00.

Additionally, David Jr. also knew about Ona's poor mental and physical condition. Although the circuit court order does not expressly state that David Jr. knew about the specifics of Ona's physical and mental condition, David Jr. knew Ona was transferred to a nursing home; David Jr. visited Ona "a few times" at the nursing home; David Jr. retained a good relationship with Ona; and, most importantly, David Jr. was aware Harvey was about to be given Ona's power of attorney. Based on this knowledge, the Court finds that David Jr. knew that Ona was not mentally capable of acting in her own interests, or at a minimum, should have known that Ona was not mentally capable of acting in her own interests.[19]

David Jr. was also aware, and ensured, that no one capable of acting in Ona's interest knew about the sale.[20] David Jr. did not discuss the sale with Harvey, did not bring a notary to the closing, and chose to close without waiting for Harvey to be given Ona's power of attorney or to be present the closing. Through his actions and silence, David Jr. displayed the reckless disregard for the truth described by the court in *Moen,* which satisfies the knowledge requirement of § 523(a)(2)(A). Accordingly, in the light of his knowledge of the appraisal and Ona's mental condition combined with his actions and silence regarding the closing with Ona, the Court finds that David Jr. knew of his false representations, and hence, the false pretenses that he created and the actual fraud that he was perpetrating. The second element of § 523(a)(2)(A) is satisfied.

---

[19] Even if this inference is not safe, the Court finds that, at a minimum, David Jr. should have known that Ona was not mentally capable of acting in her own interests, which finding also satisfies the knowledge element. See *Moen*, 238 B.R. at 791 and *Woolley*, 145 B.R. at 834.

[20] David Jr. said Ona told him that Harvey was going to be present at the "closing," but this claim alone is not enough to prove that Harvey knew about the sale.

David Jr. also intended to defraud and deceive Ona and her beneficiaries. A finding of intent under § 523(a)(2)(A) "'does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question.'" *Moen*, 238 B.R. at 791 (quoting *Moodie-Yannotti v. Swan* (*In re Swan*), 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)). "'Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred.'" *Id.* (quoting *Caspers v. Van Horne* (*Van Horne*), 823 F.2d 1285, 1287 (8th Cir. 1987)). "'Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act.'" *Id.* (quoting *Duggan*, 169 B.R. at 324).

In this case, there is no direct proof of David Jr.'s intent to deceive Ona; rather, the Court must infer his intent based on his testimony, his actions, and his silence. David Jr. consistently chose to keep his transactions with Ona, Paul Sr., and Dixie Management private. Because of these decisions, the Court does not find David Jr.'s testimony regarding his intent to be credible. By choosing to keep the transaction private, David Jr. prevented probable interference from someone acting on Ona's behalf. David Jr.'s actions were those of a person seeking to take advantage of his elderly, sick, great aunt. A person that lacked an intent to deceive, standing in David Jr.'s position and knowing what David Jr. knew, would have either waited for Harvey to be appointed or consulted with someone acting on Ona's behalf—and not just for Ona's sake. It would be reasonable to be concerned about conducting a business deal with someone in Ona's condition and to make sure that someone was present to attest that Ona was not being taken advantage of so that the deal would not be questioned or set aside.

Because it appears David Jr. did not possess these concerns, even behaving so recklessly as to bring Ona a pre-notarized deed, the Court does not believe David Jr. had an honest intent. Because David Jr. was aware of Ona's condition, he had a duty to speak to someone who *was* capable of making decisions on Ona's behalf. "'When the

circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression.'" *Moen*, 238 B.R. at 791 (quoting *Trizna & Lepri v. Malcom* (*In re Malcolm*), 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).  Ona was not capable of determining the facts surrounding the sale, and Ona's representatives were not aware of the sale.  In contrast, David Jr. knew about the sale and the circumstances surrounding the sale.  David Jr. had a duty to correct this false impression, but he did not do so, and, instead, deliberately acted to ensure the false impression endured.

Based on David Jr.'s actions and this Court's finding that his testimony concerning his intent was not credible, the Court finds that David Jr.'s representations were made deliberately and intentionally with the intention and purpose of deceiving Ona, satisfying the third element of § 523(a)(2)(A).  Because the Court has found that the remaining two elements of § 523(a)(2)(A) have been met, the Court finds that the debt embodied by the circuit court judgment was incurred by false pretenses and actual fraud, and, therefore, is a nondischargeable debt under § 523(a)(2)(A).

### Paul Sr.'s Actual Fraud

As stated above, the circuit court order satisfies the false representation, justifiable reliance, and damage elements of § 523(a)(2)(A).  The remaining elements to be examined with regard to Paul Sr. are whether Paul Sr. knew that his representations were false at the time he made them and whether Paul Sr. made the false representations deliberately and intentionally with the intention and purpose of deceiving Ona.  In examining the totality of the circumstances and the findings in the circuit court order, the Court finds that Graham met his burden of proving the remaining elements of § 523(a)(2)(A).

In examining the three alternatives under § 523(a)(2)(A), Paul Sr.'s false representation can be best characterized as actual fraud.  Paul Sr.'s fraudulent actions, and, ergo, his false representations, concern his efforts to help David Jr. perpetrate a fraud upon Ona by

acquiring her land, and his silence to anyone who could act on Ona's behalf.  The Court
finds that the two remaining elements have been met—first, that Paul Sr. knew at the
time he took these actions he knew that they would aid David Jr. in perpetrating a fraud
upon Ona; second, that Paul Sr. acted deliberately and intentionally with the intention
and purpose of deceiving Ona.

Regarding the first remaining element, the Court finds that Paul Sr. knew his actions
were fraudulent.  The circuit court order found that "David and Paul worked together to
acquire Ona's property in David's name . . . ."  (Pl.'s Ex. A at 4.)  Paul Sr. did not have
direct contact with Ona concerning the sale of her land to David Jr.  Instead, Paul Sr.
worked behind the scenes negotiating the sale of Ona's land beginning in spring 2003,
obtaining financing to enable David Jr. to purchase Ona's property for $250,000.00, and
ultimately establishing trusts within which to place the sale proceeds, (Pl.'s Ex. A at 7).
Paul Sr. testified that he helped David Jr. purchase the property because David Jr. was his
son.  Paul Sr. would like the Court to believe that he was only acting to help his son buy
some property from Ona; that Ona had a "sharp mind"; and that it was an accident that
Paul Sr. became the co-trustee and beneficiary of a trust that sold the land to Dixie
Management.  However, Paul Sr.'s actions complemented David Jr.'s efforts too well to
be serendipitous and altruistic, and his obfuscatory testimony was not credible.

Paul Sr. testified that he "had no idea" how much Ona's property was worth in spring
2003.  However, Paul Sr. did know that his mother's property, located within three miles
of Ona's property, sold to Dixie Management for $19,000.00 an acre in either 2002 or
2003.  Additionally, Paul Sr. testified that while his mother's property was more
desirable for "building purposes," Ona's property was more desirable for "commercial
purposes."[21]   Therefore, while Paul Sr. may not have known the exact value of Ona's

---

[21]   Defense counsel tried to draw comparisons between the sale of Ona's land to
David Jr. and the sale of Ona's land to a church, presumably in order to establish that the
sale price to David Jr. was reasonable.  According to the testimony, Ona sold seven acres
of real property to a church on January 30, 2003, for $10,000.00 an acre.  However, as

property, he had more than "no idea."  And, certainly, after Arkansas National Bank's appraisal, Paul Sr. would have a better idea.  Like David Jr., Paul Sr. was also not asked at the January 13 hearing whether he learned the amount for which Ona's property appraised before David Jr. and Ona closed in December.  However, Paul Sr. was even more closely involved with the transaction with Arkansas National Bank than David Jr.  Paul Sr. signed the promissory note and mortgaged his home.  Given his proximity to the transaction, it is difficult to believe that Paul Sr. was not informed of the appraised value.  Further, Paul Sr. engaged in negotiations with Dixie Management, which would include the negotiation of a sales price.

Besides his knowledge about the value of Ona's land, Paul Sr. also knew, or should have known, about Ona's age and failing health.  Paul Sr. visited Ona at the nursing home twice.  He was also close with David Jr., who also visited Ona at the nursing home.  Paul Sr.'s initial assertion at the January 13 hearing that he could not remember what Ona's health was like in 2003, followed by self-serving opinions about Ona's health in 2003 that singled out her "sharp mind" renders his testimony not credible.  Based on the fact that Paul Sr. knew Ona was in a nursing home, visited her twice, and his incredulous testimony about Ona's health, the Court finds that Paul Sr. either knew, or should have known, that Ona did not have the mental capacity to handle her business affairs.

Additionally, like David Jr., Paul Sr. was silent to Harvey and family members concerning his and David Jr.'s efforts to purchase Ona's land and his own efforts to finance and then sell the property to Dixie Management.  Also, Paul Sr.'s testimony admitting that his role regarding the trusts was "accidental" is confusing, as negotiating trusts and determining the trustee and beneficiaries requires affirmative steps.

---

Graham pointed out, the transactions were different in that Ona "came out and told the people and nobody knew that [the Ensigns] bought the property at all."  Additionally, the sale was to a *church* instead of to an individual, for, arguably, commercial purposes.

23

In sum, the Court finds that Paul Sr. was aware of the fraud he and David Jr. were perpetrating on Ona—Paul Sr. knew David Jr. was trying to purchase the property from Ona; knew about the Offer and Acceptance executed by Ona and David Jr.; knew or should have known the appraised value of the Ona's property; knew for how much David Jr. was purchasing Ona's property; knew for how much his mother's comparable property had sold; and knew about Ona's failing health. Regardless, Paul Sr., like David Jr., chose to keep this knowledge to himself. Because the Court finds that Paul Sr. knew his actions aided in perpetrating a deception upon Ona, the second element of § 523(a)(2)(A) is met.

Regarding the third element—the final element of § 523(a)(2)(A) to be satisfied—the Court finds that Paul Sr. deliberately and intentionally aided David Jr. in deceiving Ona. Paul Sr. did not take a hands-off approach to the transaction. Instead, Paul Sr. procured (1) a $250,000.00 loan, which he "loaned" to David Jr. so that David Jr. could purchase Ona's land, (2) a buyer for Ona's land, and (3) the trust in which the land was placed. Paul Sr. asserted at the January 13 hearing that he made no money on the property. However, Paul Sr. was a beneficiary of the trust that held the proceeds from the sale of the property to Dixie Management, and he benefitted from his recreational use of the land in Franklin County that the trust purchased. (Pl.'s Ex. A at 7.) While Paul Sr. may have had no interest in *purchasing* Ona's land from her directly, Paul Sr. displayed a significant interest in arranging the transaction—a transaction that resulted in substantial benefits for both David Jr. and Paul Sr. Paul Sr.'s intent to aid David Jr. in perpetrating the fraud is also evident from the fact that he, like David Jr., kept the transaction a secret from anyone who could have acted in Ona's interest. Because the Court finds that Paul Sr. possessed an intent and purpose to deceive Ona, the third element of § 523(a)(2)(A) is satisfied.

Because the five elements of § 523(a)(2)(A) have been met, the Court finds that Paul Sr.'s actions constituted actual fraud. Therefore, under to § 523(a)(2)(A), Paul Sr. may not discharge the debt to Graham embodied by the circuit court judgment.

24

**Conclusion**

For the reasons stated above, the plaintiff's requests for relief under § 523(a)(2)(B) and (4) in each adversary proceeding are denied; the plaintiff's request for relief under § 523(a)(2)(A) in each adversary proceeding is granted. Neither Paul David Ensign, Sr., nor Paul David Ensign, Jr., may discharge the debt embodied by the circuit court order.

In Paul David Ensign, Jr.'s Answer to the Complaint, he requests that he be given full credit for the assets surrendered to the creditor. Graham testified that he has applied credits to the balance of the judgment, and that the remaining balance owed is $678,848.77.[22] Graham also testified that he would continue to apply credits as property that was turned over by the Ensigns is sold.[23] Nothing in the testimony suggests that Graham is improperly applying credits or otherwise failing to comply with his duties as executor, and the Court will not adjust the credits Graham has made. Regardless of how the judgment is ultimately reduced or paid, the judgment entered by the circuit court order is nondischargeable.

IT IS SO ORDERED.

March 25, 2011
_____
DATE

_Ben Barry_
_____
BEN T. BARRY
UNITED STATES BANKRUPTCY JUDGE

---

[22] Of this amount, $43,423.19 is interest.

[23] Graham testified that the estate is still holding two pieces of real estate that are under a probate order to be sold, and a real estate investment trust. Graham testified that the balance of the judgment will be reduced by the amounts for which the real property sells. Graham testified that the real estate investment trust was purchased for $50,000.00 and is currently listed for sale. He expects it to sell for less than its purchase price, but the amount it sells for will be subtracted from the judgment balance.

25

cc:    Ben T. Roberds, attorney for Bobby Graham in case 5:10-bk-72578
       Theresa Pockrus, attorney for Bobby Graham in case 5:08-bk-74027
       J. Robin Pace, attorney for Paul David Ensign, Sr. and Paul David Ensign, Jr.
       John T. Lee, chapter 7 trustee in each case